# *Attachment 'A'*

Redacted

The following Affidavit is submitted to the Court to document the probable cause in support of a request for the
issuance of an Arrest Warrant for **STAUCH, Letecia** DOB:REDACTED SSN: DATE FILED: February 28, 2020

This offense is fully documented in El Paso County Sheriff's Office Offense Report **20-1382** detailing the offense(s)
listed below in Paragraph 2:

With the victim(s) identified as: Stauch, Gannon; REDACTED Race: White; Gender: Male

1.  Your Affiant is Jessica Bethel, a duly sworn and state certified Police Officer and Detective with the El
    Paso County Sheriff's Office (EPSO), who has been employed as such since 2010. Your Affiant has
    participated in other law enforcement investigations, including homicide investigations, child abuse,
    weapons violations, assaults, and other violations of Colorado Revised Statutes. I am familiar with social
    media networks, and electronic methods of communication. I have attended a one week crime scene
    analysis training course through the Colorado Bureau of Investigation. I have also relied on other
    investigators from outside Agencies with more investigative training and experience, including, but not
    limited to, Federal Bureau of Investigation (FBI) Special Agent Andrew Cohen, and FBI Special Agent
    David Donati.

2.  Your Affiant submits the following facts to demonstrate probable cause to believe that, on or about
    January 27, 2020 in the county of El Paso, in the State of Colorado, the defendant, Letecia Stauch, also
    known as (AKA) Letecia Hardin, did commit the following offenses (hereinafter referred to as "The
    Violations"):

    -Murder in the First Degree – Child Under Twelve – Position of Trust, §18-3-102(1)(f)

    -Child Abuse Resulting in Death, §18-6-401(1)(a), (7)(A)(I)

    -Tampering with a Deceased Human Body, §18-8-610.5

    -Tampering with Physical Evidence, §18-8-610(1)(a)

3.  This affidavit is being submitted to support the issuance for an arrest warrant for The Violations.

4.  The facts in this affidavit come from my personal observations, my training and experience, and
    information obtained from other agents, law enforcement officials, and witnesses. The contents of this
    affidavit were derived by reading reports, viewing evidence, and as provided to me by other EPSO
    investigators, and Special Agents of FBI.

5.  Much of this affidavit was prepared by FBI Special Agent Cohen, but I have reviewed the below facts
    carefully, and have no reason to doubt any investigator's accuracy or truthfulness in their reports. This
    affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and
    does not set forth all of my knowledge about this matter.

6.  In summary, and as will be set forth below, probable cause exists to issue an arrest warrant for Letecia
    Stauch for The Violations. The vast array of investigative techniques in this investigation has produced a
    voluminous amount of evidence in support of the requested warrant.

7.  Investigators have executed physical search warrants and collected evidence from vehicles associated
    with Letecia, cellular devices utilized by Letecia, and from the residence of Letecia. Electronic search
    warrants have been executed to entities including, but not limited to, Facebook, Apple Inc, Google Inc,
    AT&T Wireless, Verizon Wireless, ADT Security System, Tile, Life360, Yahoo, and Ring Doorbell
    Service. Some of the physical evidence has been examined by a laboratory for DNA profiles.

8.  Investigators also recovered a significant amount of exterior video footage from individual, privately
    owned neighborhood security cameras, businesses around Colorado Springs, Colorado, and cameras in
    other surrounding areas. Some cameras provided recorded footage of the exterior of the Stauch residence.

9. Historical cellular records and historical cell site details were analyzed and 

10. Some, but not all, of the available photos and other evidence collected from the aforementioned search warrants and other investigative steps are included below, and are not meant to represent all the evidence available. Furthermore, there has been no intentional exclusion of photos that could be deemed exculpatory in nature.

11. The information contained in this affidavit can be found in EPSO Case Report No. 20-1382.

## Facts in support of probable cause

### *The Stauch Family and general information*

12. The Stauch Family is a blended family, and all will be discussed at various points below. This representation purposely has little details, in order to give an overview of the family structure:

    a. Father – Eugene "Al" Stauch

    b. Stepmother – Letecia Stauch

    c. Daughter – Harley Hunt, minor, 17 years of age (by blood to Letecia, not Al)

    d. Son – Gannon Stauch, minor, 11 years of age (by blood to Al, not Letecia)

    e. Daughter – Laina Stauch, minor, 8 years of age (by blood to Al, not Letecia)

13. The following vehicles will be discussed at various points below:

    a. Red Nissan Frontier – Mr. Stauch's main vehicle

    b. Black Volkswagen Tiguan – Letecia's main vehicle

    c. White Volkswagen Jetta – Harley's main vehicle

    d. Silver Nissan Altima – a rental car obtained by Letecia's Aunt, Brenda Acquard, and utilized by Letecia from January 30-February 1, 2020, after her Tiguan was seized by EPSO on January 29, 2020.

    e. White Kia Rio – a rental car obtained and utilized by Letecia on January 28-29, 2020.

### *Background of those mentioned in this affidavit*

14. Letecia Stauch, AKA Letecia Hardin, date of birth REDACTED is the last person known to investigators to see eleven-year-old Gannon Stauch, date of birth REDACTED alive. Letecia is Gannon's stepmother, and was Gannon's only known adult supervision in the days preceding and on the day of his murder. At the time of Gannon's murder, Letecia was employed by School District 20 as an assistant teacher, although I have also learned that she is no longer employed there.

    a. I was able to locate prior criminal history for Letecia, and learned that in North Carolina Robeson County Court Case 2001CRS011193, Letecia was convicted after a trial for communicating threats, a misdemeanor, but I was not able to locate her sentencing information. Letecia was also convicted of unauthorized use of a motor vehicle in Robeson County Court Case 2001CR014645, and was sentenced to 45 days confinement and 18 months of probation.

    b. Although not criminal in nature, I was able to locate a document memorializing the suspension of Letecia's North Carolina teaching certificate #261777 on or about May 11, 2016. As part of that document, it is reported that Letecia had filed unsubstantiated claims of harassment and retaliation, and the North Carolina state board found "...that Mrs. Stauch breached her contract

by engaging in unprofessional conduct, willfully neglecting her duty, and failing to comply with the provisions of her contract…"

c. Letecia's criminal history is only included by way of background for the court, and because Letecia has been convicted of previous crimes, it is not meant to indicate guilt of The Violations, or to be considered as the sole basis of probable cause for the requested warrant.

15. Eugene Albert Stauch, AKA Al Stauch, date of birth REDACTED is Gannon's biological father, and is married to Letecia Stauch. Mr. Stauch was deployed with the National Guard during the dates of January 25, 2020 to January 28, 2020. Mr. Stauch spent the night in Denver on January 25, 2020, and departed via commercial airline on January 26, 2020, returning via commercial airline on January 28, 2020. Investigators were able to corroborate this information, and Mr. Stauch has cooperated fully in the below investigation.

## *Summary of a Multi-Agency Missing Person Investigation in Colorado*

16. Of note, and in some portions of this affidavit, depending on the date of events being discussed, the investigation may be referred to as a missing person investigation, or a murder investigation. For the purposes of this affidavit, they are indeed one and the same.

17. The subsequent information primarily surrounds the period of Monday, January 27, 2020, to Wednesday, January 29, 2020. Investigators have taken independent steps to corroborate information received throughout the investigation, and in most circumstances, have video footage, cellular communication and location records, security system records, or other records to support the below claims. This summary section is only meant to give the court an overview of the investigation, and the facts supporting this summary will be articulated below.

18. On January 27, 2020, at or about 1855 hours, Letecia Stauch reported Gannon missing after calling 9-1-1. During that call, she was instructed to call the El Paso County Non-Emergent line. In summary, Letecia stated Gannon was supposed to be home approximately 1 hour ago, and that she was unable to locate him at his friend's house. Her story dramatically changed multiple times over the following days.

19. As will be discussed below, investigators do not believe Letecia went to any neighboring houses to attempt to locate Gannon, and was one of many lies told by Letecia during the investigation. Letecia was unable to provide the actual location of the homes she went to, the names of Gannon's friends he was supposed to be playing with, or the names of the parents of Gannon's friends.

20. Deputies responded to Letecia's residence at 6627 Mandan Dr, Colorado Springs, Colorado, and were unable to locate Gannon. Deputies conducted a limited search of the residence, and took a report from Letecia. Some of the interactions between the responding Deputies and Letecia were captured on body worn camera. A missing person investigation was initiated, and in the coming days developed into a murder investigation.

21. A tip line was established, and investigators received hundreds of tips and leads from the public by virtue of emails and telephone calls. As part of this tip line, two ransom notes were received by email demanding money (in the form of bit coin) in exchange for Gannon's return. Investigators took steps to validate these ransom notes, including resolving and geolocating the Internet Protocol (IP) addresses from the email headers, and requesting subscriber information from the Internet Service Providers (ISP) that hosted those IP addresses. One of these ransom notes was sent from a foreign based email account that is accessible by multiple individuals. Investigators were unable to trace the user of the IP addresses, and believe the ransom notes to be fraudulent, and strictly designed as a scheme to receive money.

22. Letecia initially claimed that she last saw Gannon on January 27, 2020 when he left their residence to play with his friends somewhere around 1515 hrs. Based on the facts outlined below, and Letecia's statement to an EPSO Dispatcher, Letecia is the last person that ever saw Gannon alive. Letecia stated she

attempted to find him at a neighbor's house, and sent her daughter, Harley Hunt DOE REDACTED to look for Gannon at a park.

23. Letecia lied to investigators on multiple occasions, has unexplained abnormal behavior such as obtaining a rental car, disconnecting her cell phone from the cellular network for an extended period of time, the false reporting an alleged rape, abnormal patterns of travel, a continuously evolving story with material changes in facts and circumstances, and has since left the State of Colorado. These actions, when combined with other facts in this affidavit, support the totality of probable cause for the requested warrant, and will be discussed below.

### The murder of Gannon Stauch

24. The following section will outline what investigators have learned about Letecia's activity on January 27, 2020, and outline the period when Gannon was likely murdered. Some of the information contained in this section will be repeated in other portions of this affidavit, or discussed later in more detail. Additionally, there are evidence sources that are mentioned here, but not fully defined in other sections.

25. Investigators believe that Gannon was murdered by Letecia Stauch in the afternoon hours (after approximately 1414hrs) of January 27, 2020, at his residence, and more specifically in his bedroom. Physical evidence recovered from the residence and inside Gannon's bedroom supports that a violent event occurred in his bedroom, which caused bloodshed, including blood spatter on the walls, and enough blood loss to stain his mattress, soak through the carpet, the carpet pad, and stain the concrete below his bed. Some photographs of this evidence are included below.

26. **Based on evidence recovered from the residence, Gannon's remains were eventually brought through the house, into the garage, and likely loaded into the back of Letecia's Volkswagen Tiguan. After cleaning the murder scene, Letecia utilized the Tiguan to transport and dump Gannon's remains on the evening of January 28, 2020. Letecia likely disposed of his remains off Hwy 105/S Perry Park Rd in Douglas County, Colorado. Indeed, the Metro Crime Laboratory determined that blood discovered in Gannon's bedroom, the Stauch's garage, and blood on a piece of particleboard located off Hwy 105/S Perry Park Rd all matched his DNA profile.**

27. On Monday, January 27, 2020, Gannon Stauch stayed home from school. Based on text messages from Letecia to Mr. Stauch, Gannon was up most of Sunday evening with a stomach problem. Letecia did tell Gannon's school, Grand Mountain Elementary, that Gannon would be absent on Monday. Investigators were able to verify that Gannon was marked as an excused absence that day. Letecia also told Al that "...I'm just going to give them an excuse at work and stay with him..." Indeed, Letecia did come up with an excuse, and told her employer via text message (at or about 0437hrs) that her Stepdad was killed after being hit by a car, and she would not be able to come to work that day.

28. Other electronic evidence, such as time and date stamped photographs and videos were recovered from Letecia's cellular telephone that indicate Gannon was likely still alive during the morning of January 27, 2020.

29. As displayed in paragraph 54 below, images were taken on Letecia's cell phone at or about 0813 and 0817hrs on the morning of January 27, 2020 showing Gannon sleeping in his bed. Of particular note, his Nintendo Switch (a small video game console) is visible in the photo lying next to him on the bed. Mr. Stauch has said that this gaming system was of high importance to Gannon. To date, investigators have been unable to locate the Nintendo Switch. It should also be noted that Letecia used her phone the following day, January 28, 2020 at or about 1257 hrs to conduct a Google search "can nintendo find my switch". This is also detailed in a list of some of her search history in paragraph 141 and reasonably occurred because she was contemplating how she would dispose of the Switch.

30. I conducted a Google search for the term "can nintendo find my switch" and learned that the Switch does not come with any sort of tracking ability. As such, Letecia likely felt it was safe to dispose of the Switch

and used the missing Switch to help deceive law enforcement into searching for Gannon as a possible runaway.

31. Ultimately, investigators located video surveillance from a neighbor's surveillance camera that showed what investigators believe to be Letecia and an individual that appeared to match Gannon's physical description depart their residence in the Nissan Frontier at or about 1016hrs on January 27, 2020.

32. The video camera is several homes away, and does not provide images clear enough to make positive identifications of those captured in the recording. The vehicle returned at or about 1419hrs, and Letecia exited the vehicle. After viewing the video, I cannot be sure if another person exited the vehicle or not, but I submit Gannon likely did return home with Letecia that afternoon. These times, corroborated by data collected from an ADT Security System installed in the Stauch's residence, are discussed below in more detail.

33. Based on data returned from the Stauch's ADT Security System, the motion detectors in the living room or basement did not register any activity from approximately 1012hrs until Letecia and Gannon enter the home at approximately 1422hrs. Investigators confirmed Laina to be at school, and confirmed that Harley was at work. As such, investigators believe there was likely nobody else in the residence except Letecia and Gannon.

34. Letecia's historical cell site information, detailed information about her iPhone's status, and a text message sent to Harley from Gannon's cell phone, support that Letecia left her cell phone at the Stauch residence the morning of January 27, 2020. The fact Letecia left her phone at home is suspicious on its own, based on her history of extensive use of the phone.

35. I have reviewed forensic search records from Letecia's phone, and found she is an active user of social media, including, but not limited to, Facebook and Instagram. A more detailed review of Letecia's iPhone Screen Time log between January 25, 2020 at 0800hrs and January 29, 2020 at 1100hrs revealed that Letecia spent approximately 38,607 seconds on Facebook and Facebook messenger alone, which equates to approximately 10.7 hours of cumulative time over those few days.

36. Letecia's telephone was locked at or about 0956hrs on January 27, 2020, and unlocked at 1445hrs on the same day. The timing of the unlocking of the device is significant as compared to her departure and arrival to/from the residence, and should be noted by the Court. Particularly, Letecia did not open her phone for approximately 30 minutes after she arrived back to the residence.

37. On January 27, 2020 there was a message sent from Gannon's phone to Harley's phone that reads "Tecia left phone at home if you need her text me". This message was sent at or about 1037 hrs.

38. Investigators were able to confirm, based on video surveillance footage and purchase receipts, that Letecia traveled to PetCo, located at 5020 N Nevada Ave, Colorado Springs, Colorado. This PetCo is approximately 22 miles from the residence and is an approximate 30-minute drive (based on Google Maps directions). The receipt shows that Letecia completed her purchase at or about 1122hrs. Gannon is not visible on any of the surveillance video obtained at PetCo.

39. Letecia's whereabouts are unknown between approximately 1122hrs and 1322hrs. At 1322hrs, Letecia was again captured on video surveillance making a second purchase at the same PetCo on N Nevada Ave. Mr. Stauch sent a text message to Gannon's cell phone at or about 1206hrs that read "Hey buddy". This message was unanswered until 1321 hrs. The response was "Can I play Zelda at least". Mr. Stauch replied "Not today".

40. A significant event occurred on Gannon's phone at or about 1343hrs, which is prior to arriving back at the Stauch residence. There was an internet search for "can my parent find my cell phone.if its off". I submit that this internet search was likely conducted by Letecia on Gannon's phone, and not Gannon himself based upon the content of the search, the way the search terms are phrased, and the presence of a "." in between "phone" and "if". This is very similar to the way Letecia conducted searches on her phone,

however I located other internet searches with a "." in Gannon's search history, which I also reasonably believe were conducted by Letecia. A more detailed explanation of Letecia's search history is included below in paragraph 141.

41. Furthermore, the search term was "parent", singular. I submit it is reasonable that Mr. Stauch only, not Letecia, would be interested in the location of Gannon's phone, and that Letecia was possibly deliberating on how, or if, she would dispose of Gannon's phone after she murdered him.

42. I conducted the Google search of "can my parent find my cell phone.if its off" and learned that the first answer returned in the search engine reads "The answer to your question depends on what method is being used to track your location…" Gannon's phone was found at the residence. I submit that Letecia did not get rid of Gannon's phone for fear it might be traceable.

43. The Nissan Frontier returned to the Stauch Residence at or about 1420hrs. A search warrant, authorized by this court, was executed on the Nissan Frontier, and found no indications of blood inside the vehicle.

44. Letecia had been without her cell phone for hours, yet her screen was not unlocked until approximately 1445 hours, which was 25 minutes after arriving back at the residence. During that 25-minute period there is motion activity both upstairs and downstairs on the ADT records.

45. Laina returned home from school around 1515hrs. During a recorded forensic interview with investigators, Laina stated that when she returned home, Letecia told her Gannon was asleep in her bed, and that she could not see him. Letecia told Laina to go outside and play. I submit that Laina was sent outside because Gannon was likely dead, and Letecia was cleaning up blood from inside the house.

46. At or about 1555hrs, Mr. Stauch sent another message to Gannon's phone, "Hey buddy". This message was not read until 1940hrs. It is likely that Gannon was already murdered by Letecia at the time Mr. Stauch sent the message.

47. Based on exterior video footage, Harley arrived at the residence in her white VW Jetta at or about 1642hrs and picked up Laina.

48. At or about 1652hrs on January 27, 2020, Letecia sent a text message to Harley requesting carpet cleaner, trash bags, and baking soda. These items were likely used to clean up the murder scene. Harley purchased these items, and investigators located a receipt documenting the purchase. Harley Hunt has refused to speak with investigators.

49. Investigators do not believe that Harley was present when Gannon was killed. Harley was at work on January 27, 2020 from 0830-1615hrs, and investigators were able to verify this with her employer,

50. To be clear, investigators have not located any evidence that any person other than Laina and Letecia had access to Gannon between approximately 1000hrs and 1734hrs on January 27, 2020.

*Statements and images captured on body camera on January 27, 2020*

51. Your affiant has reviewed body worn camera (BWC) footage and reports obtained from a deputy that responded to 6627 Mandan Dr, the residence of the Stauch family. After responding, Letecia provided verbal consent for Deputies to search the house for Gannon. By the way of timeline, EPSO Patrol responded at or about 2209 hrs, approximately three hours after Letecia initially called 9-1-1.

52. From the BWC, I learned the Volkswagen Tiguan, known to be leased and utilized by Letecia, was backed into the garage when EPSO was at the residence. The position of the Tiguan in the garage is significant, specifically because of the confirmed presence of Gannon's blood in the garage below the area where the rear hatch of the Tiguan would be, and the positive reaction of Blue Star reagent (indicating likely presence of blood) on the Tiguan's rear bumper.

53. Responding Deputies also searched in Gannon's basement bedroom, and I have viewed images of Gannon's bedroom taken from the BWC. Below, I have included a BWC image of Gannon's bedroom on

the left. On the right, an image recovered from Letecia's cellphone, after executing a search warrant that was applied for, and granted by this court. These images both represent the condition of Gannon's bedroom on January 27, 2020, at or about 0813 hrs, and just after 2200 hrs.

54. This photo comparison is significant for many reasons, and the corner of the bedroom where Gannon's head is visible is the key area discussed in several sections below (see right image below taken at 0813 hrs).

   a. The placement of Gannon's bed is in the immediate location where his blood (based on DNA profile results) was found on the wall, the carpet, and on the concrete below the carpet. These details are discussed below, and a large volume of blood appears to have been in that area.

   b. For the purposes of comparison between the images, it appears that although the sheet may or may not be the same, the blankets are different, and the pillowcase, if not the whole pillow, is different. I submit that a logical explanation for the missing bedding is that they likely were saturated in blood after Gannon's murder, and were removed by Letecia to clean up the murder scene. Furthermore, investigators were unable to locate the bedding in the Stauch residence during any of approximately five searches of the residence.

 

*BWC Snapshot from EPSO on 1/27/2020 at 2200 hrs*        *Image taken on 1/27/2020 at 0813 hrs*

55. Another photo was recovered from Letecia's cell phone that shows his bed was not pushed directly against the wall by the head of the bed. This photo articulates the ability for blood to get onto the walls and floor in the corner of the bedroom. Mr. Stauch stated the positioning of the bed is unusual, and the bed is usually pushed against the wall.



*Photo from the morning of January 27, 2020, particular attention to top left of bed*

**The need to rent a 2019 Kia Rio**

56. Mr. Stauch spent the night in Denver on January 25, 2020, and flew out of Denver International Airport on January 26, 2020. Investigators were able to corroborate he traveled to Dallas, Texas and ultimately to Oklahoma based on his flight records. On the morning of January 28, 2020, Letecia rented a 2019 Kia Rio from Avis Rent-A-Car in Colorado Springs. Letecia picked Mr. Stauch up at the Colorado Springs Airport at or about 0850 hrs on January 28, 2020, shortly after Letecia rented the vehicle. Letecia and Mr. Stauch drove back to their residence from the airport in the rented Kia.

57. The timing of the rental of the Kia is suspicious, and combined with forensic evidence later obtained from the Tiguan and discussed below, tends to place additional importance on why Letecia felt compelled to rent a vehicle that morning. Investigators located no evidence that the Tiguan was not mechanically functioning, or noted any reason why it could not have been physically driven. In fact, the Tiguan remained parked in the Colorado Springs Airport Short Term parking lot until approximately 1900hrs on January 28, 2020.

58. Letecia provided statements to her husband, Albert Stauch, that she was concerned about putting mileage on her Tiguan lease, which justified the vehicle rental. It is noted however, that during the time of the Kia rental, Letecia only put about 71 miles on the vehicle. During the time period Letecia had the Kia, she would not provide the location of the Tiguan, and Mr. Stauch never saw the Tiguan. For example, she told Mr. Stauch that the Tiguan was near French Elementary School.

59. Between investigators and Mr. Stauch, a limited search for the Tiguan was conducted, and produced negative results. Investigators later learned she left the vehicle in the short-term parking lot of the Colorado Springs Airport, but removed the vehicle at or about January 28, 2020 at 1900 hours. The Kia Rio was returned on the morning of January 29, 2020.

60. I submit Letecia could not pick her husband up in the Volkswagen Tiguan because it likely would have revealed evidence of Gannon's murder, including blood or the actual remains of Gannon himself.

### *The Kia Rio*

61. Investigators applied for, and were granted by this court, a search warrant for the 2019 Kia Rio rented by Letecia Stauch. This vehicle was located at the rental car company at the Colorado Springs Airport, and had not been rented to another customer in-between the time Letecia dropped the vehicle off, and when investigators seized it.

62. Investigators did take a swab from a stain that was confirmed to be blood in the trunk of the Kia Rio, and submitted it to the Metro Crime Laboratory for analysis. A DNA profile was developed, and determined it was a mixture of two contributors, one of which was male, and the major male profile did not match Gannon Stauch's DNA.

63. I submit that because the Kia Rio is a rental car, it has likely been utilized by a large number of people, and the blood in the trunk may or may not be related to the investigation, and investigators have not been able to determine the likely age of that blood and have not matched it to any known DNA profiles associated with this case.

64. Investigators noted the Kia had a significant amount of mud underneath the vehicle, but this did not provide any successful investigative leads in looking for Gannon's remains. Investigators collected the air filter of the vehicle, and attempted to identify particles that might be useful to identify where the vehicle might have been.

65. Investigators were unable to recover any GPS data, or location history for the Kia Rio.

### *Letecia's Volkswagen Tiguan is significant*

66. The Volkswagen Tiguan is important to investigators, because they believe the Tiguan was used to transport the remains of Gannon from the Stauch residence to a location where Gannon's body was dumped. The definitive locations of the Tiguan are unknown to investigators during the time period of approximately 1902hrs on January 28, 2020, to approximately 1200hrs on January 29, 2020. Investigators believe Letecia dumped Gannon's remains on the evening of January 28, 2020, and utilized the Tiguan to do so. The Tiguan was seized from Letecia on January 29, 2020.

67. Letecia had a scheduled interview with investigators on January 29, 2020 at the EPSO, located in downtown Colorado Springs, Colorado. When she arrived at or about 1200hrs she was driving the Volkswagen Tiguan. Investigators noted that the vehicle was wet and appeared to have been recently cleaned. I submit that Letecia had to clean the vehicle, because there was likely visible blood on the rear end, based on the below luminol reactions. Indeed, video footage was recovered that shows a partial view of a car wash located at E Platte Ave/Bonfoy Ave in Colorado Springs, Colorado. This video captured a portion of a black SUV, consistent with the VW Tiguan, at or about 1130hrs on January 29, 2020 at the car wash. The time and location are consistent with raw data obtained from the Tiguan's computer system, described in more detail below beginning in paragraph 152.

68. Investigators applied for, and were granted a search warrant for the Tiguan, which was seized from Letecia at her interview, and towed to the EPSO Evidence Facility. On or about February 1, 2020, the FBI Evidence Response Team (ERT) conducted a search of the Volkswagen Tiguan. In summary, the forensic portion of the search revealed possible traces of blood on the rear of the vehicle, a rear passenger seat, front passenger seat, and an area near the glovebox based on luminol Forensic latent blood stain reagent tests. Swabs from the trunk area were sent to the Metro Crime Laboratory for further analysis. These results revealed that a DNA profile could not be developed, and that the swab from the trunk was negative for the presumptive presence of blood.

69. To be clear, luminol is a chemical used to detect trace amounts of blood at crime scenes, and although I do not have a chemical or biology background, I have learned that luminol reacts with iron in

hemoglobin, found in blood. When applied, luminol emits a blue glow when a reaction occurs. I am also aware that there are things other than blood that could cause a reaction, such as other chemicals, and I do not submit that just because luminol reacted with a substance, that the substance must be blood, and only that there is a strong probability of suspected blood. The positive reaction to luminol is meant to be combined with other facts in this affidavit in support of probable cause.

70. Several areas of the Tiguan reacted to luminol, as mentioned in paragraph 68. Specifically, the search team found evidence of suspected blood on the rear bumper, and step plate of the rear bumper. The location of the blood is significant, because this vehicle was backed into the garage at Letecia's residence the day of Gannon's murder. The search of the residence is discussed below, but it is noted that evidence of Gannon's blood (based on DNA profile) was also located on the floor of the garage, consistent with where the rear end of the Tiguan would have been.

71. A photo is included below to demonstrate the reaction of the luminal reagent to the likely presence of blood. Particularly, the position of the reaction leads investigators to believe that blood was likely in contact with the rear bumper of the Tiguan, and most reasonably while loading Gannon's remains in the trunk. Swabs from the exterior bumper have also been submitted to the Metro Crime Laboratory, but those results have not yet been returned. However, The Metro Crime Laboratory did return a result from the trunk of the Tiguan that was negative for the presumptive presence of blood.



*Luminal reaction on the rear bumper of the Tiguan*

72. Within the Tiguan, a receipt from a Dollar store was located, time stamped January 27, 2020 at 1714 hrs, and documented the purchase of trash bags, baking soda, vinegar, and the items listed in paragraph 74.

73. Investigators believe that Harley purchased these items at the direction of Letecia, based on the following text message, sent from Letecia's cell phone to Harley's cell phone on January 27, 2020 at or about 1652hrs.

**Letecia:** "Carpet powder 2 things, baking soda, trash bags"

74. Also included in this Dollar store purchase was baby oil, baby lotion, cotton rounds, and bubble gum. Investigators do not believe these other items were involved in the cleaning of the murder scene, and likely have no investigative value at this point.

75. I know from personal experience that baking soda and vinegar are common household items that can be used to clean blood. Additionally, I conducted open source internet searches that revealed vinegar is one

of the most common items used to clean blood stains, and that when baking soda is applied to blood stains prior to vinegar, it has an efficient effect in removing blood stains.

76. While the purchase of items such as vinegar and baking soda are common, and in no sense illegal on their own, the timing of the purchase of these items and Gannon's suspected murder are beyond coincidental.

77. Also located was a parking receipt for the Colorado Springs Airport that documented the Tiguan was brought into the Airport short term parking lot at or about 0830hrs, and left the lot at or about 1902hrs, both on January 28, 2020.

78. On January 29, 2020, Letecia returned the rented Kia at approximately 0900hrs, and she was picked up by someone driving the white Jetta. Investigators were unable to confirm that Harley was driving the Jetta, but it is her primary vehicle, and her historical cell site location from her cellular telephone records support her phone was in that area. As such, I believe Harley was likely driving the Jetta.

79. Investigators were able to download telematics and stored electronic data from the Tiguan. A more in-depth exploitation of the Tiguan's electronic systems, more specifically its historical locations were developed and will be discussed below in more detail beginning paragraph 152. Investigators were able to determine some of the locations of the Tiguan on the evening of January 28, 2020, including its location in the area of Hwy 105/S Perry Park Rd in Douglas County, Colorado.

80. Investigators also served a search warrant to AT&T related to an International Mobile Subscriber Identity (IMSI) designated to the Tiguan's Carnet feature. AT&T responded to this search warrant, and provided Network Event Location System (NELOS) data, that would give an estimated location of the Tiguan. The data revealed that during the evening of January 28, 2020, between 2030 and 2220hrs, the Tiguan was generally in the greater northwest portion of Colorado Springs, and likely also in an area North of the Air Force Academy and southern Douglas County. I submit that during this time period, investigators believe that Letecia disposed of Gannon's remains.

81. Of note, during the time period of approximately 2030 and 2220 hrs on January 28, 2020, Harley's cell phone is connected to a tower that would service the Stauch residence, over approximately 30 miles from Letecia's suspected location. There was activity on Harley's telephone during that time, and investigators do not believe that Harley was with Letecia when she disposed of the body. However, at approximately 2226 hours, Harley's cell phone leaves the Stauch residence, and goes to the area of Powers and Carefree, where investigations suspect she picked Letecia up.

## The January 29, 2020 interview and the report of an alleged rape of Letecia Stauch

82. As mentioned above, Letecia voluntarily came to the EPSO for an interview with investigators, but only after she was evasive and avoided speaking with investigators one-on-one. Her interview was audio and video recorded, and the below information includes her own statements, as well as investigation geared towards corroborating those statements. In general, her statements are reasonably categorized as untruthful, incomplete, and misleading.

83. Letecia was supposed to arrive at 10am on January 29, 2020, but did not arrive until Noon. Although she spoke with investigators on the phone several times, she did not want investigators coming to her home, and was difficult at best to track down. Investigators provided food and water to Letecia during the interview.

84. Of interest, Letecia brought several pieces of notebook paper with her that contained notes she had written down. During the interview, she referred to these pieces of paper, and asked investigators if she could just read her notes. Investigators were not able to seize these documents. I have conducted hundreds of interviews of subjects, victims, and witnesses. It is extremely rare for an individual to bring notes to an interview.

85. Letecia drastically departed from her initial statements given to EPSO Deputies regarding the report of Gannon's disappearance. In summary, Letecia said she had been held at gunpoint and raped by a Hispanic male she knew as "Eguardo", and that Gannon was abducted by that male after he finished raping her. The interviewing Detectives believed her statements were false based on prior experience investigating sexual assault cases.

86. Letecia said she arrived home around 1430 hours on January 27, 2020, and she disarmed her security system, and then went into the basement. She said that "Eguardo" was in the basement, attacked her, and pointed a gun at her. She said that after "Eguardo" held her at gunpoint, he allowed her to go upstairs to greet her stepdaughter, Laina Stauch, DOB 01/22/2012, who had just arrived home from school. Letecia said she sent her outside to ride her bike, then returned to the basement where "Eguardo" vaginally penetrated her against her will between 1530 and 1630 hours. During this period, she believed that she had hit her head and may have blacked out. Investigators noted no injuries on Letecia's head during their contact with her.

87. Letecia also said that during the attack; Gannon jumped on "Eguardo's" back and that "Eguardo" was able to throw Gannon off his back and across the room. After "Eguardo" had finished, he had the gun held to Gannon, and demanded a suitcase. Letecia provided him with a brown suitcase and a cardboard box. "Eguardo" attempted to sexually assault her again, but she hit her head and blacked out again.

88. Letecia stated that she tried to fight "Eguardo" off, but was unsuccessful. I know from training and experience that if an individual holds another person at gunpoint, he or she would likely not allow the person to have opportunity for escape as Letecia described being allowed to greet her stepdaughter upstairs before returning to the basement. Most crucially, if Letecia's story was accurate, any reasonable person would have immediately called 9-1-1 and reported the home invasion, rape, and kidnapping of their child. Letecia called law enforcement hours later, and did not report the alleged rape until approximately two days later.

89. Of even more significance, Letecia said she cleaned up the area where this alleged attack had happened. She straightened up signs of disturbances in Gannon's room, and cleaned up the utility room. Investigators recovered cleaning supplies, such as carpet brushes, which contained suspected carpet fibers. I submit that Letecia did in fact clean something up, but it was the murder scene of Gannon, not a sexual assault.

90. Investigators took steps to corroborate Letecia's statements before dismissing them as false and misleading. For example, investigators reviewed video footage from a neighborhood security camera that captured the exterior of the Stauch residence from the day of Gannon's murder, and did not observe a Hispanic male entering the house. Investigators did observe Laina arrive home on the school bus at or about 1511 hours, observed her enter the residence, and observed her riding her bike at or about 1530 hours.

91. Furthermore, Letecia was offered the opportunity to have a Sexual Assault Nurse Examiner (SANE) conduct a forensic examination at a local hospital. Ultimately, Letecia did not want to have the exam completed. When given the opportunity to provide investigators with evidence that would possibly identify "Eguardo", Letecia refused to cooperate.

92. Letecia stated that she met "Eguardo" on January 26, 2020, the day prior to Gannon's murder. She generally described a Hispanic male with brown hair and brown eyes, but could not provide any specific identifying information. In summary, she told investigators that Gannon had knocked over a candle on Sunday, causing the carpet to burn. After that incident, she drove around the neighborhood where residential construction was taking place. She met "Eguardo", who was working on a house, and asked if he would repair the carpet in her home. "Eguardo" agreed, and Letecia provided him the garage door code, and they agreed he would repair the carpet while she was shopping the next day.

93. To the extent Letecia spoke about Laina, investigators were able to corroborate those statements, but never observed "Eguardo" or anyone else arrive or leave the residence during that time period based on exterior neighborhood video footage of the front of the Stauch residence. Specifically, exterior video footage revealed that Laina was riding her bike outside between approximately 1530 and 1542 hrs. Furthermore, the front door of the residence opened and closed at 1528hrs, based on data from ADT Security System, discussed more below.

94. I know from training and experience that when individuals concoct lies, most reasonably to conceal the truth, they often times leave portions of truths within those lies. I submit that the statements Letecia made reference Laina, and the time period Laina was at the residence, are likely true based on video evidence. Her other statements, however, are blatant lies designed to mislead investigators.

95. Investigators also reviewed Letecia's phone records during the time period of the alleged rape, of 1530-1630 hours on January 27, 2020. During this time period, Letecia had phone activity to include an outgoing phone call, and numerous iMessages (Text Messages using an iPhone) to Mr. Stauch and Harley, namely to discuss purchasing a new set of headphones for Albert. These text messages occurred at the following times: 1541, 1542, 1543, 1544, 1545, 1611, 1619, and 1620.

96. Investigators also were granted a search warrant by this court that was served to ADT Home Security, which requested data stored on the ADT servers related to The Stauch residence. The Stauch residence was equipped with basement and living room motion detectors, and contact detectors on the front and rear door. ADT was in possession of logs that documented the time, date, and type of event that generated a log. For example, when either motion detector was activated, or the front or rear door opened or closed, there is a record of that event.

97. Letecia claimed that she was raped in the basement between 1430 and 1530hrs. During that time, the back door of the residence, located on the main level, was opened and closed ten times. If indeed Letecia was being raped in the basement, it would be impossible for her to open the upstairs back door of the residence at the same time. I submit that Letecia's claims of being raped in the basement are false, based on her cell phone activity, and the stored ADT data.

98. The logs from ADT indicate significant activity in the basement of the residence where evidence suggests Gannon was murdered. For example, between January 23, 2020, and January 26, 2020, and the hours of 1500-1700, the average number of basement motion events was 3.5. On January 27, 2020, the average number of basement motion events was 10.3. A possible scenario for the increase in activity is that Letecia was going upstairs and downstairs in order to get cleaning supplies, and cleaning the murder scene.

99. Towards the end of the interview, Letecia said she wanted to leave. Investigators seized her telephone, and detained her while they applied for a search warrant to obtain DNA collection. Letecia began stuffing tissues in her pants, and said she was having chest pain and shortness of breath. Investigators immediately requested medical assistance, and paramedics from the Colorado Springs Fire Department arrived. Letecia had appropriate responses to the paramedic's questions.

100. I am aware that Letecia has made statements regarding Gannon's disappearance to individuals other than law enforcement, including, but not limited to, her friend, her husband, and the media. Indeed, some of those conversations have been captured and memorialized in recorded phone conversations, and email messages. Letecia's stories have continued to evolve, and material facts continue to change, including, but not limited to, the identify of her attacker, the location of Gannon's abduction, and details of the alleged rape.

101. During her statements, Letecia did deny killing Gannon, and provided explanations as to why there was blood in her Tiguan, blood in Gannon's room, and why she was in the area of Palmer Lake, Colorado.

*Letecia is transported to a local hospital in Colorado Springs on January 29, 2020*

102. Letecia was transported to the hospital via ambulance from the EPSO for further medical attention. Letecia was accompanied by Detectives during the ride to the hospital. Unlike questions at the EPSO by paramedics, during the ambulance ride, Letecia was unresponsive to questions by medical personnel, and seemed to have a miraculous recovery when they arrived at the hospital. The ambulance ride was audio recorded.

103. Letecia received medical care at the hospital, and the details of that care is not included in this affidavit for medical privacy reasons. Letecia did not have any life-threatening issues, and signed herself out prior to all her exams being completed.

104. Letecia continued evasive behavior at the hospital, but particularly after investigators told her they were going to detain her pending the issuance of a search warrant to collect her DNA. Ultimately, the search warrant for the collection of non-testimonial evidence was signed, and executed. A second warrant for the compelled SANE exam was initially authorized by this court, but then was quashed by the court. To be clear, Letecia did not allow a SANE exam to be completed.

105. Letecia was not in custody after the warrant was executed at the hospital, and left the hospital without telling investigators. She also made a phone call from the waiting room at the hospital. There was physical surveillance being conducted by law enforcement in the area, and investigators learned Letecia was picked up by an unknown person at the hospital, and was reunited with her daughter several miles from the hospital.

106. Although her behavior was not illegal, I submit that as pressure continued to increase from investigators, Letecia became more and more desperate to leave the hospital, likely because she feared being caught in her lies. Furthermore, Letecia did not want to pursue collecting evidence that might assist law enforcement in identifying and finding her supposed rapist.

### *Searches of Letecia's residence and discovery of confirmed blood in Gannon's bedroom*

107. Investigators searched the Stauch residence several times over several weeks after applying for, and being granted, search warrants from this court. The purpose of these searches was to collect evidence, including biological evidence, in support of the captioned investigation. The forensic searches were conducted by the Colorado Springs Metro Crime Lab. To avoid confusion, the January 28, 2020 initial search was authorized by Mr. Stauch, and he provided consent to search the residence. Not all of the evidence recovered is included below, however the forensic testing results of several items, including a pair of size 8.5 Nike Shoes, are discussed in paragraph 126.

108. Gannon's remaining family members were living in the residence during the period of these searches, and investigators did not initially seal the residence off. Crime scene analysts from the Colorado Springs Metro Crime Lab responded to the residence and found traces of blood throughout the residence based on Blue Star Forensic latent blood stain reagent tests. There was visible blood in Gannon's room, in the garage, and other portions of the house.

109. Blue Star Forensic stain has similar limitations to luminol, which has been described and discussed above.

110. By way of background, the residence located at 6627 Mandan Dr, Colorado Springs, Colorado is a ranch style single family home, approximately 2,500 sq ft with a two-car attached garage. There are four bedrooms, and three bathrooms in the residence. Two of those bedrooms are in the basement, including Gannon's. Next to Gannon's room, there is an unfinished utility room, and on the other side of the basement another bedroom and a bathroom. There is a staircase with a small landing that allows access from the main level to the basement, and the garage is accessible from inside the residence.

111. The Blue Star reagent was applied to Gannon's bedroom, the hallway leading to the utility room from his bedroom, the utility room itself, the staircase and landing leading upstairs from the utility room, the

pathway to the garage from the stairs, and the garage area itself. In all of these areas, investigators found positive results for the likely presence of blood.



*Blue Star Reaction at the base of the stairs in the garage at the Stauch residence*

112. Specifically in Gannon's bedroom, in a corner of the room, investigators located an area where suspected blood had seeped through the carpet, through the pad, and stained the concrete. Furthermore, there was also bloodstain and projected blood spatter located on the walls in this area. Indeed, over 50 droplets of suspected blood were found on the walls near Gannon's bed. Crime Scene investigators also suspected someone attempted to clean the walls based on the way the Blue Star reagent reacted on the wall.

113. Gannon's mattress was also seized and contains a red stain consistent with blood in the same area as the stain on the carpet, and the blood cast off on the walls. The stains on the mattress were swabbed but were not tested with Blue Star reagent. The laboratory results have not yet been returned, but because other blood in the area was determined to be Gannon's blood, investigators suspect the blood on the mattress is also Gannon's blood.

 

*The likely blood stains on Gannon's matress*

114. I have included several crime scene photographs that include the wall next to Gannon's bed, and the carpet and carpet pad that was removed by investigators to expose the concrete below. Based on the orientation of Gannon's bed, the vast majority of the blood would be in line with the position of his head and torso, and consistent with the stain of the mattress displayed above.

115. I submit that the blood located in Gannon's room appears to have been cleaned up, based on residual blood residue on the baseboards, an electrical outlet cover, and the blood that soaked through the carpet. DNA laboratory testing has confirmed it was indeed Gannon's blood, and Gannon's body has not been found, reasonably indicating this was likely the scene of Gannon's murder.

116. Investigators have requested, but have not yet received, a report from Tom Griffin, who is an International Association for Identification (IAI) certified Senior Crime Scene Analyst (CSCSA), a Bloodstain Pattern Analyst (CBPA), and a Crime Scene Reconstructionist (CCSR). Mr. Griffin examined the blood spatter on Gannon's walls. Mr. Griffin preliminarily reported that the stains on the walls are consistent with one or more blood spatter producing events, which could include gunshot, blunt force, or a stabbing. Mr. Griffin did not believe the blood stains were aspirated blood, primarily due to the lack of air bubbles in the stains. Furthermore, the shape of the stains were affected by the surface texture of the drywall itself. The final report from Mr. Griffin has not yet been received, and is pending a peer review.

117. Trace evidence swabs of suspected blood were obtained from the electrical socket next to Gannon's bed; these swabs revealed the blood was indeed Gannon's blood, based on DNA profile testing. The electrical socket also has evidence of streak marks, which are reasonably suspected to be from Letecia's attempted cleaning. When investigators removed the outlet cover, a visible red stain was present outlining its edges. The presence of this stain tends to support that there was enough blood around the outlet cover to seep around its edges, leaving a visible outline.



*Electrical socket next to Gannon's bed with blood, and socket with cover removed*



*Photo of the wall next to Gannon's bed, marking suspected blood stains*

118. I have also included a photograph of the suspected blood stain in the concrete, located in the corner of the bedroom where Gannon's bed was positioned (this stain is also visible in the photo depicting the suspected blood spatter on the walls). The carpet above this stain in the concrete was clean, and investigators suspect Letecia cleaned the area based on carpet fibers on scrub brushes, the acquisition of carpet cleaning supplies, vinegar, and baking soda. 6627 Mandan Dr. was a new construction build, and the Stauch family was the only family to reside in this residence.



*Blood on the concrete on Gannon's bedroom*

119. On January 29, 2020, investigators recovered a piece of carpet from the utility room with possible blood stains. The recovery of this carpet tends to further support the positive alerts from the Blue Star reagent in

the utility room. The Metro Crime Lab reported the substance tested presumptively positive for the presence of blood, but was unable to develop a DNA profile.

120. On January 29, 2020, investigators found in the dishwasher, multiple carpet brushes with suspected carpet fibers on them, and the dishwasher appeared to have been run. Investigators believe these brushes were used to clean up the murder scene. To be clear, no formal testing was completed to confirm the fibers on the brushes were carpet.

121. Investigators also located an empty gallon size container of vinegar within the residence. Mr. Stauch believed there was approximately ½ of the container left before he left for Oklahoma on January 25, 2020. As mentioned above, additional vinegar was purchased on January 27, 2020.

122. EPSO Deputies that responded to the Stauch home on January 27, 2020 did not notice the blood stains in Gannon's bedroom and it should be noted the initial report was that Gannon had left the home and had not returned. As additional information was developed, more forensic searches of Gannon's room were conducted, which revealed the aforementioned evidence. There were small traces of blood found in the depressions of the drywall and paint texture that Letecia failed to remove when she cleaned the murder scene.

## *Metro Crime Laboratory Report Case # 20MCL00267*

123. I have received and viewed Metro Crime Laboratory Report Lab Case #20MCL00267, completed by Serologist Sherrie Holmes/6622. Although I have discussed results related to this DNA testing in other portions of this affidavit, the intention of this section is to provide clarity and eliminate ambiguity of which samples were submitted to the laboratory, and which samples were, or were not, attributable to Gannon Stauch's DNA. Additionally, there is an unknown contributor in some of the DNA profiles that were developed. As mentioned elsewhere in this affidavit, I do not have a biology background, but I am aware that a DNA profile is very accurate.

124. Investigators submitted swabs from Gannon Stauch's toothbrush bristles, toothbrush head, and from a tooth retainer that Mr. Stauch said belonged to Gannon. DNA buccal swabs were also taken from Gannon's biological father, mother, and from Letecia Stauch. From these samples, DNA profiles for these individuals were developed, and used as a comparison for other testing.

125. In summary, Gannon's DNA profile was found from blood samples taken in the garage, on the outside of size 8.5 Nike shoes, and in Gannon's bedroom. Letecia's DNA was recovered from the interior of the size 8.5 Nike shoes. I submit to the court that the lab results tend to corroborate the theory that Gannon was indeed murdered in his bedroom, brought into the garage, and his remains loaded in the Volkswagen Tiguan, subsequently to be disposed of in an unknown location.

126. To be more specific, a serology study was conducted by the Metro Crime Laboratory, and the following samples tested positive for the presence of blood. These samples were also analyzed and compared to known DNA profiles of Gannon Stauch, Letecia Stauch, and Albert Stauch.

   a. 4269 S-01A.01 **(taken from a piece of carpet found inside a carpet roll in the utility room)**– Found to be mixture of three contributors, at least one of which is male. A DNA profile was not suitable for comparison due to the number of contributors and the complexity of the mixture.

   b. 4269 S-14.01.01 **(taken from the garage of the Stauch residence, directly under where the rear hatch of the Tiguan when reversed into the garage)**– This DNA profile from the blood is a mixture of two contributors, one of which is male. The major profile matches Gannon Stauch.

   c. 4269 S-14.02.01 **(taken from the garage of the Stauch residence, directly under where the rear hatch of the Tiguan when reversed into the garage)**- This DNA profile from the blood is a mixture of two contributors, one of which is male. The major profile matches Gannon Stauch.

d. 4269 S-14.03.01 **(taken from the garage of the Stauch residence, directly under where the rear hatch of the Tiguan when reversed into the garage)**- This DNA profile from the blood matches Gannon Stauch.

e. 6839 SW1-01.01 **(taken from the carpet at the base of the garage stairs)**- A DNA profile could not be developed, but tested presumptively positive for the presence of blood.

f. 6839 SW2-01.01.01 **(taken from the blood-stained carpet fibers in Gannon's bedroom)**- A DNA profile was obtained from the blood, and matches the DNA profile of Gannon Stauch.

g. 6839 SW2-01.02.01 **(taken from the corner of Gannon's bedroom on the carpet pad by his bed)**- A DNA profile from the blood stain matches Gannon Stauch.

h. 6839 SW2-02.01 **(taken from the electrical outlet cover in Gannon's bedroom by his bed)**- A DNA profile from blood stain is a mixture of two individuals, at least one of which was male. The major profile matches the DNA profile of Gannon Stauch.

i. 6839 SW2-03.01**(taken from the electrical socket in Gannon's bedroom by his bed)**- A DNA profile was obtained from the blood, and matches the DNA profile of Gannon Stauch.

j. 6839 SW2-04.01.01 **(taken from the back side of the carpet in Gannon's bedroom, near his bed)**- A DNA profile was obtained from the blood, and matches the DNA profile of Gannon Stauch.

k. 6839 SW2-04.02.01 **(taken from the blood stain on the top of the foam from the carpet in Gannon's bedroom)**- A DNA profile was obtained from the blood, and matches the DNA profile of Gannon Stauch.

l. 1153998 **(taken from the trunk area of the Volkswagen Tiguan)**- Was found to be negative for the presumptive presence of blood.

m. 4269 S-08 **(taken from a teal couch pillow in the basement of the Stauch residence)**- Was found to be presumptive positive for the presence of blood, but no DNA profile was able to be developed.

n. 4269 S-01.02.01 **(taken from outsole of the right Nike shoe)**- A DNA profile was obtained after swabbing a confirmed bloodstain on the outsole of the right size 8.5 Nike shoe, and was found to match the DNA profile of Gannon Stauch. Furthermore, a DNA profile was obtained from a swab of the inside of the shoe, which matched the DNA profile for Letecia Stauch.

### *Historical cell site location for related cellular telephones*

127. Investigators applied for and were granted search warrants by this court to obtain historical call detail records, to include cell site locations, of cellular devices known to be utilized by Letecia and Harley. Your Affiant has reviewed information from this analysis, and in summary, learned the following information.

128. Historical cell site analysis helps to determine the location of a cellular telephone based on cell tower antenna locations and orientation. Locations are determined by activity of the cellular telephone, and represent an approximate area, not an exact location. Different cellular carriers report this information in different formats and fashions.

129. The historical cell site analysis identified unusual activity for Letecia, including potentially disconnecting her cell phone from the cellular network for several hours. I submit that by disconnecting the phone, Letecia intended to prevent law enforcement from being able to determine her location. Specifically, this occurred on January 28, 2020, during the evening she disposed of Gannon's remains.

### *The search of Letecia's cellular telephone*

130. Investigators applied for and were granted a search warrant for Letecia's cellular telephone. A physical download was conducted, and investigators were able to recover data inclusive of text messages, call records, the specific times her cell phone was unlocked, battery levels, and other information. In summary, investigators learned that Letecia lied to her employer, her husband, her friends, her daughter, and the children's babysitter. I will not include each and every text message or lie.

131. Additionally, there are messages that would otherwise tend to corroborate her statements about Gannon's whereabouts on the afternoon of January 27, 2020, if in fact he did go to play with his friends. As discussed in other portions of the affidavit, Letecia's story was false and misleading, and these messages were likely sent by her as part of a larger plan to support her initial lies about his disappearance.

132. For example, on January 28, 2020, at approximately 0514 hrs, Letecia had a conversation with Stephanie, the children's babysitter (saved in the phone as "Stephanie Sitter"). There is no indication that Gannon ever went to a doctor, and Letecia never brought that up with investigators. Some, but not all of their conversation is below.

| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:14:21 AM(UTC-7) | Outgoing | This happened at after 3:30 |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:14:40 AM(UTC-7) | Outgoing | We talked to him then and told him to be home by 6 |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:14:44 AM(UTC-7) | Incoming | someone posted he wasn't at school either |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:15:06 AM(UTC-7) | Outgoing | He had to go to doctor for his stomach |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:15:28 AM(UTC-7) | Outgoing | But he was here in the afternoon |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:15:20 AM(UTC-7) | Incoming | where did he say he was at |
| From: To: | Stephanie Sitter | 1/28/2020 | 1/28/2020 5:16:47 AM(UTC-7) | Outgoing | Honestly I don't keep up with friends |

133. Letecia made statements to investigators via text message that could be considered exculpatory in nature related to the presence of blood in the basement of their residence, as seen in the below text message. I have talked with investigators that were inside the Stauch residence on January 27, and 28, and 29. There was no odor of smoke, and no evidence of smoke. In fact, one Detective noted the basement smelled like coconut, and was very pleasant. Furthermore, I know that burns often times do not produce wounds that bleed profusely.

| Participants: Nicole (owner) | J Maybe: | Outgoing | When we came back inside from the smoke there was blood on both of us. I didn't know what to do. I was scared I would get fussed out about it and I didn't know if he should go to the doctor. I kept trying to add the candle thing but Albert kept sayin it was small and minor. I was scared the basement was smoky and when I threw the covers on everything we both had blood. | 1/29/2020 2:14:33 AM(UTC-7) |
| Participants: Nicole (owner), | Maybe: | Outgoing | You don't understand how hard it is to be a step mom | 1/29/2020 2:14:46 AM(UTC-7) |

134. The below message appears to contain instructions from Letecia to Harley to purchase carpet powder, baking soda, trash bags, on or about January 27, 2020 4:52pm. These messages are important, because investigators believe the purpose of these items was to clean up blood from the murder of Gannon. This text message was also referenced above in paragraphs 72-76.

| Participants: Nicole (owner), Daughter | Maybe: | Outgoing | Carpet powders 2 things, baking soda, trash bags | 1/27/2020 4:52:08 PM(UTC-7) |

135. Investigators also recovered limited GPS and location data from Letecia's phone. There are crucial time periods, such as the evening on January 28, 2020, that investigators were not able to recover location history because Letecia disconnected her phone from the cellular network, or turned the phone off.

136. Letecia stored several written notes within her iPhone. The majority of these notes contained what appeared to be usernames, passwords, or insurance information. There were several notes that appeared to reference her unhappiness in the relationship, and shed some light on potential household instability.

### *Letecia's internet activity between January 25-29, 2020*

137. I was able to review some, but possibly not all, of the stored internet search history and the websites visited, recovered from the forensic physical download and search of Letecia's iPhone.

138. Between the dates of January 25-January 28, 2020, Letecia viewed websites associated with searching for a job in states other than Colorado such as Los Angeles, CA, Orlando, FL, Pensacola Beach, FL, and Fort Lauderdale, FL. Letecia also viewed apartments, and 2-bedroom rental properties in Florida. Additionally, she visited a moving cost calculator website.

139. Letecia's internet activity also captured the search for a rental car, and visited the website Priceline.com on January 28, 2020, at or about 0817hrs. I submit this timing is consistent with the acquisition of the Kia Ria, mentioned in this affidavit.

140. Letecia appeared to use Google, a popular online search engine. I have included some of her queries to Google, along with the date and approximate time of the search. Not all of her Google searches are included below. I submit that Letecia's search history is important, because the history suggests she might have been struggling as a stepparent, and additionally suggests she was not happily married to Mr. Stauch (see Items 1, 10, 12, 13, 14). While her search history alone does not provide motive to murder Gannon, it does shed light on her inquisitive thoughts of her position with the family, memorialized in Google's search engine.

141. I also direct the Court's attention to the way Letecia's search terms are sometimes entered; Letecia hits the "." key instead of the space key multiple times while searching the internet (in approximately 44% of the searches listed below). This will be significant during the discussion of a search conducted on Gannon's phone, as was discussed above in paragraph 40, and will be further discussed below. There are other searches on Letecia's phone that use a ".", and additional search history over a longer time span does exist that is not listed below.

| Item | Google Search Text String | Date and Time |
|---|---|---|
| 1 | find real military singles - Google Search | 1/25/2020 12:16:10 PM |
| 2 | parenting should be 4 people not one - Google Search | 1/25/2020 1:40:05 PM |
| 3 | im over doing all the work for my step kids and their mom doesnt help - Google Search | 1/25/2020 1:40:55 PM |
| 4 | mom advice from stepmom - Google Search | 1/25/2020 1:41:45 PM |
| 5 | if you aren't involved it your kids life you are shitty - Google Search | 1/25/2020 1:48:55 PM |
| 6 | my husbands ex wife does nothing for her lids - Google Search | 1/25/2020 1:49:50 PM |
| 7 | i wonder if my husbands ex wife is sending me a card since l.raise.her.kids - Google Search | 1/25/2020 1:51:20 PM |
| 8 | i wonder if my husbands ex wife is sending me a valentines card since l.raise.her.kids - Google Search | 1/25/2020 1:51:55 PM |
| 9 | i wonder if my husbands ex wife is sending me a valentines card since l.raise.her.kids - Google Search | 1/25/2020 1:52:40 PM |
| 10 | one day some people will.wish they treated you differnetly - Google Search | 1/25/2020 1:54:05 PM |
| 11 | one day some people will.wish they treated you differently - Google Search | 1/25/2020 1:54:15 PM |
| 12 | w/y should my husband chose.me ober family - Google Search | 1/25/2020 3:35:35 PM |
| 13 | find me a rich guy who.wants me to take care of his kids - Google Search | 1/25/2020 7:57:00 PM |
| 14 | find a guy who wants me to take care of.his.kids and get paid - Google Search | 1/25/2020 7:58:05 PM |
| 15 | its crappy some parents dont care for their kids or buy them presents - Google Search | 1/26/2020 9:25:25 AM |
| 16 | parents are those who put thwir kids before their nails - Google Search | 1/26/2020 9:26:55 AM |
| 17 | parents are those who put thwir kids before their nails - Google Search | 1/26/2020 9:27:05 AM |
| 18 | my son.burned the carpet how.do i fix.it - Google Search | 1/27/2020 12:09:30 AM |
| 19 | will.humidfier.help if exposed to smaoke - Google Search | 1/27/2020 12:42:50 AM |
| 20 | smoke affects will humidifer help - Google Search | 1/27/2020 12:43:20 AM |
| 21 | smoke from fire affects will humidifer help - Google Search | 1/27/2020 12:43:30 AM |
| 22 | colorado law for kid stating at home - Google Search | 1/27/2020 12:55:40 AM |
| 23 | School is out. is it okay for my kid to stay home alone?   CO4KIDS | 1/27/2020 12:57:20 AM |
| 24 | son is sick but I have to.go to.work. - Google Search | 1/27/2020 1:01:25 AM |
| 25 | son sick can he stay.home - Google Search | 1/27/2020 1:03:25 AM |
| 26 | suede repair kit for sofa - Google Search | 1/27/2020 4:40:40 AM |
| 27 | el paso sherriffs office number - Google Search | 1/27/2020 6:54:45 PM |
| 28 | what is the process for.our runaway child. - Google Search | 1/28/2020 4:15:40 AM |
| 29 | police steps for our runaway - Google Search | 1/28/2020 4:16:05 AM |
| 30 | police steps for.our missing child. - Google Search | 1/28/2020 4:16:30 AM |
| 31 | todays.flight okc to cos - Google Search | 1/28/2020 4:36:05 AM |
| 32 | can nintendo find my switch - Google Search | 1/28/2020 12:57:10 PM |
| 33 | car net volkswagon - Google Search | 1/28/2020 4:18:45 PM |
| 34 | they are asking for our sons tooth brush but said nothing is wrong - Google Search | 1/28/2020 4:19:40 PM |

*Letecia's search activity from her iPhone, spanning 1/25/2020 (1216hrs) - 1/28/2020 (1619 hrs)*

142. Investigators were also able to recover internet search history that was deleted from Letecia's phone. No time and date association was located with the data, and I can only ascertain that the searches were conducted prior to the EPSO seizing Letecia's phone on January 29, 2020. Some, but not all, of the search history is included below. Some of the other deleted search terms included travel planning, shopping, job searches, and other seemingly innocent activity. I have not purposely left out any particular search that would be exculpatory in nature, and I am not intending to portray that all of Letecia's deleted searches were nefarious in nature.

| Item | Search Term |
|------|-------------|
| 1 | find me a new husband book |
| 2 | i feel like im just a nanny not a step mom |
| 3 | husband uses me to babysit his kids |
| 4 | are there any free money to move away from bad situation |
| 5 | my husband never post about me but does eveything else |
| 6 | my husband only cleans up for the army not me |
| 7 | im jusg a glorified babysittef |
| 8 | find a new husband |
| 9 | sent my husband sexual messages and he ignores them |
| 10 | make my husband want me more |
| 11 | i feel like my husband uses me to babysit his kid |
| 12 | find a guy without kids |

*Some deleted internet search terms located on Letecia's iPhone. No date information was available.*

### Letecia Stauch's consciousness of guilt

143. During the first 24-48 hours surrounding the disappearance of a child, it is reasonable that an assumingly innocent parent or stepparent would be contributing to search efforts, and fully participating in the effort to recover the child.

144. In the 24-48 hours surrounding Gannon's disappearance, Letecia rented a vehicle, turned her cell phone off for approximately four hours on the evening of January 28, 2020, washed her Tiguan immediately prior to coming to the EPSO for an interview, evaded law enforcement's attempts to conduct a more in depth interview, and did not participate in the search for Gannon.

145. On Tuesday January 28, 2020, between 0848 and 0854, Letecia instructed Harley to "Pull your car in the garage" via text message, presumably to temporarily cover up any potential evidence left behind. To be clear, Harley has her own vehicle that was mentioned above in paragraph 13, specifically a Volkswagen Jetta.

146. On January 28, 2020, at approximately 1604-1617hrs, investigators asked Letecia for Gannon's toothbrush to recover his DNA. At or about 1619hrs, Letecia did a search in her internet browser of "they are asking for our sons tooth brush but said nothing is wrong". At or about 1631-1633hrs, Letecia has a text conversation with Mr. Stauch.

> Letecia: "Something isn't right I think they are hiding something"
>
> Mr. Stauch: "Who", "the police?"
>
> Letecia: "Yes", "They asked for tooth brushes"
>
> Mr. Stauch: "hmm", "what do u think they're hiding?"

147. Also on January 28, 2020 at or about 2245hrs, Letecia made a statement to investigators via text message. At the time of this statement Gannon had been missing for approximately 27 hours, and Letecia believed she was a subject in his disappearance without any prior prompting from law enforcement, or notification of such:

> Letecia: "What do you want from me? Because I have nothing. One of your very own leaked to me what you guys were doing. I did nothing and/or am being set up. I'm not really even sure other that being told that by another blue with El Paso. I was told I couldn't go home to sleep and on top of that men were sent to a home with a minor female and she was forced to stay there not to even leave for food. Every conversation that said even at this moment I can hear inside. What do you want from me?"

**Detective Bethel:** "Come in to talk to me. I would just like information to find Gannon"

148. After EPSO investigators seized Letecia's Volkswagen Tiguan on January 29, 2020, she obtained a 2020 Nissan Altima. Investigators applied for, and were granted a search warrant by this court to install a GPS tracker on the vehicle. Investigators monitored this tracking device, which provided particularly useful information on January 31, 2020. A map with some of this data is included below. This information will be discussed below, and relates to the area north of Palmer Lake and along Hwy 105/S Perry Park Rd in Douglas County, Colorado.

149. In summary, investigators believe Letecia utilized the rented Nissan Altima to return to the area in which she disposed of Gannon's body. Indeed, investigators recovered a piece of particle board from this area with Gannon's blood on it. This information will be discussed below in more detail.



*January 31, 2020 GPS tracker data in the area north of Palmer Lake, Colorado*

150. The fact Letecia came back to this area on January 31, 2020 is significant, and investigators have not uncovered any evidence that Letecia has family or friends that live in that area, or any legitimate reason for her presence in that area other than to dispose of incriminating evidence.

151. I submit a reasonable theory for the fact Letecia returned to this area, based on the information presented in this affidavit as follows. Letecia disposed of Gannon's remains at nighttime, and likely was nervous about the location she chose, and may not have even remembered exactly where she dumped Gannon's remains. Investigators believe that on January 31, 2020, she went back to the area to view the area while sunlight was available; to ensure no evidence was viewable from the road, to ensure his remains were adequately covered to prevent detection, and to see if any law enforcement was in the area.

## The exploitation of the Volkswagen Tiguan data

152. Investigators were able to remove a computer chip from Letecia's Volkswagen Tiguan, which was examined by the FBI. The FBI was able to recover data (hereinafter "raw data"), which included, but is not limited to, the estimated location of the vehicle specifically related to the evening of January 28, 2020, and the morning of January 29, 2020.

153. The raw data has not been scientifically evaluated, and the raw data that was provided was not portrayed to be an exact representation of the vehicle's activities. Additionally, I have been told that the raw data

has particular limitations, including the inability to show the exact location of the vehicle. For example, if the Tiguan was taken off road, the raw data may not show that, and display the estimated location on the nearest road. Furthermore, the estimated location may have some degree of fluctuation in accuracy, estimated to be approximately 50-100 meters.

154. FBI Agents, including Special Agent (SA) Donati, took steps to verify and corroborate the data recovered from the Tiguan. In summary, SA Donati was able to take some of the raw data, including location and time stamp, and compare it to other evidence. As with other forensic evidence discussed in this affidavit, investigators believe it to be reliable.

155. For example, the Tiguan raw data placed the Tiguan leaving the Colorado Springs Airport just after 1900hrs on January 28, 2020. This information matched the time stamp of the January 28, 2020 Colorado Springs Airport parking receipt to the Tiguan data. The Tiguan raw data indicated the Tiguan stopped near a King Soopers' parking lot for approximately 10 minutes after leaving the Airport, between 2008hrs to 2018hrs. SA Donati was able to review video surveillance footage from that King Soopers which indeed showed a dark SUV matching the description of the Tiguan sitting in the parking lot during that same time period. Other footage, including video footage from a Wendy's restaurant in a separate location, helped to further corroborate the raw data.

156. Of significant importance, the raw data showed the Tiguan in the area of Hwy 105/S Perry Park Rd between 2115hrs and 2130hrs on January 28, 2020, and I have included a map depicting that data. The raw data also indicated the Tiguan stopped for approximately five minutes, in an area proximate to the recovery of Gannon's blood on February 15, 2020. This is the same area Letecia likely drove to in her Nissan Altima rental vehicle on January 31, 2020. The recovery of Gannon's blood in this area is discussed below.



*Tiguan raw data depicting its activities on Hwy 105/S Perry Park Rd on 1/28/2020*

157. Investigators were also able to compare Letecia's historical cell site information, including NELOS data, against the Tiguan raw data, and found no reason to believe that Letecia was not the driver of the Tiguan on January 28, 2020.

### The continued evolution of Letecia's stories

158. Investigators conducted several consensually monitored telephone calls with Mr. Stauch. Specifically, Mr. Stauch, at the direction of law enforcement, communicated with Letecia via telephone and email. These communications have been recorded and memorialized, and consisted of hours of recorded conversation. I will not provide a transcription of these calls, but will summarize the importance of particular changes in Letecia's story, and will also include exculpatory information related to Letecia's statements. Letecia never admitted to killing Gannon.

159. For the purposes of refreshing the court, here is a summary of some of Letecia's statements whether to law enforcement, directly through the media, and/or to Mr. Stauch in recorded email and voice communications.
    -On January 27, 2020 Letecia stated – Gannon left to play at a friend's house, and did not come home at 1800hrs like he was supposed to. .
    -On January 29, 2020 Letecia stated – she was held at gunpoint, raped, and Gannon was abducted by her rapist.

160. Within Letecia's falsehoods, there are details corroborated by physical evidence that would be near impossible to know without being intimately involved in the murder. Letecia has made statements to explain blood on the walls in Gannon's bedroom, blood on the rear bumper of the Tiguan, and blood in the garage of the Stauch residence. Details of the location of blood evidence has not been released to the media nor to Letecia and has been closely held throughout this investigation. Furthermore, Letecia has continued to provide alibis for her physical locations not previously disclosed to investigators. Her statements continue to evolve in a dramatic way, and all are remarkably different from the original report to EPSO.

161. The majority of the conversations between Letecia and Albert Stauch began around February 13, 2020. Over several days, Letecia's story continued to change. During a phone call on February 13, 2020, Letecia stated that Gannon was burned by a candle to the point that his skin bubbled, and that Gannon peeled the burns off and wiped blood on his bedroom wall. Mr. Stauch did not ask about blood on the walls of his room during this call. The fact she provided information about blood on the wall likely indicates her knowledge of the murder scene.

162. On February 14, 2020, Letecia had an additional conversation with Mr. Stauch, and provided four additional versions of Gannon's disappearance.

Story #1: When EPSO came to the house on January 27, 2020, the abductor was still in her residence, and that she tried to signal to EPSO Deputies that there was somebody in the residence. It should be noted that EPSO Deputies checked the entirety of the house and no additional person was located during that search.

Story # 2: She was raped by Quincy Brown at her residence, and Brown abducted Gannon. She knew Brown's identity because she saw a paper and his identification card fall out of his pocket that had his name on it. Letecia sent a photograph of Quincy Brown to Mr. Stauch via text message (it is noted this photograph mirrored images online wherein Quincy Brown was listed as a Most Wanted suspect, discussed below).

Story # 3: Quincy Brown followed her from Petco, and at some point, was laying in the middle of the road in front of her car. When Letecia stopped to avoid running the man over, he jumped into her car and made her take him home, then raped her.

Story # 4: Letecia and Gannon were near County Line Rd/Hwy 105 in northern El Paso County on January 27, 2020. Gannon was riding a bicycle in that area and fell off, hit his head, and was then abducted by Quincy Brown. In this version of events Quincy Brown was driven by a man named Terence.

163. The February 14, 2020 Story #4 has several interesting considerations. During the period of February 12-14, 2020, it was public knowledge by virtue of media coverage that investigators were searching for Gannon in the area of Hwy 105/S Perry Park Rd in southern Douglas County near the El Paso County line. Letecia brought this location up on her own, without prompt during a conversation, and provided an alibi for why she was in that area. Letecia was adamant that investigator's efforts to search for Gannon in that area would be futile. This area turned out to be significant based on the Tiguan's location on January 28, 2020, and that Gannon's blood was found in this area, discussed below in more detail.

164. Furthermore, as mentioned above, Letecia drove through this same area in her Nissan Altima rental vehicle on January 31, 2020.

165. I submit that based on raw data retrieved from the Tiguan, Letecia was likely in the area of Hwy 105/S Perry Park Road on the evening of January 28, 2020, and Gannon's remains were dumped in the vicinity of that area. Letecia's story lays the foundation for a reason why investigators may locate Gannon's body with head trauma.

166. On February 15, 2020, Letecia provided additional conflicting stories to Mr. Stauch, including that the story she told Albert Stauch about Gannon falling off the bike was a lie, because it was what she believed he wanted to hear.

167. Letecia stated the blood in the corner of Gannon's room was a combination of hers and Gannon's. In this explanation, she stated that the abductor anally penetrated both her and Gannon with an object. Additionally, she was tied up at some point in the abduction, and the abductor was still present during the EPSO visit that night.

### Quincy Brown

168. Quincy Brown, age 37, was listed on El Paso County's Most Wanted list on February 10, 2020. I was able to locate Brown's photo on KKTV News website, where they describe Brown as a black male (it is noted that during one of Letecia's stories, she described her rapist as a Hispanic male). The photo on this website appeared to be the same photo Letecia sent to Mr. Stauch. Brown has outstanding arrest warrants for failure to register as a sex offender, and failure to appear. These warrants appear to have been open since 2018.

169. I was able to find a criminal history for Quincy Brown, date of birth 10/21/1981, which included, but was not limited to, a 2001 arrest for 1st Degree Kidnapping in El Paso County Court Case 2001CR4383, which was pled to Felony Menacing. Investigators have uncovered no evidence to support that Quincy Brown was involved in Gannon's disappearance.

### Gannon's blood is located in Douglas County, Colorado on February 15, 2020

170. As mentioned above, investigators began to focus a search effort for Gannon's remains in the area of Hwy 105/S Perry Park Rd in Douglas County, Colorado on February 12, 2020. There is not an exact address to reference due to the rural nature of the area. This particular location was deemed important based on raw data from the Tiguan on January 28, 2020, and the location data from her rental vehicle on January 31, 2020.

171. On February 15, 2020, searchers located a piece of particleboard during that search. The particleboard had a stain that appeared to be consistent with blood, and is pictured below. I have added a red circle to indicate the location of the blood stain. The particleboard was collected by the FBI Evidence Response Team, and transported to the Metro Crime Lab, also on February 15, 2020. An initial test revealed a positive presumptive result for the presence of human or high primate blood. Further testing was conducting, and a DNA profile was developed and compared to Gannon's on February 16, 2020. That profile matched the DNA profile of Gannon Stauch, and is documented in Metro Crime Laboratory Report 20MCL00267.



*Particleboard located in the area of Hwy 105/South Perry Park Rd*

172. The reasonable explanation for the discovery of this particleboard, with Gannon's blood on it, is that Letecia used this particleboard during the disposal of Gannon's remains.

173. The area in which the particleboard was found is rural, and the ground was covered by approximately six to twelve inches of snow. Additionally, as the area is rural in nature it is likely populated by wildlife including predators such as bear, coyotes, and mountain lions. Gannon's remains have not been located, and while investigators will continue to search the area, it is possible those remains have since been scattered since January 28, 2020.

174. The below map depicts the area where the particleboard was recovered, compared with raw data from the Tiguan's location (while idling for approximately five minutes) on January 28, 2020, and the GPS tracker data from the Nissan Altima on January 31, 2020. As noted above, the raw data of the Tiguan has an estimated 50-100meter variance.



*Approximate location of particleboard vs. Tiguan and Altima approximate tracking data*

### Wiretap Interceptions

175. ████████████████████████████████████████████████████
████████████████████████████, Additionally, investigators were granted a pen register/trap and trace device order, global positioning system (GPS) pings, and cell site sector information. Investigators monitored Letecia's telephone, and recorded hours of communication between Stauch and others. Each and every communication intercepted is not included within this affidavit.

176. As during other portions of the investigation, Letecia continued to provide different stories to different people about Gannon's disappearance. Letecia provided false information to her sister, and other family members. ████████████████ during which Letecia provided multiple different stories for what happened to Gannon. Several of these stories were discussed above.

177. On a February 16, 2020 call at or about 1928hrs, Letecia told a female, believed to be Teela Cummings, that she has been giving Al numerous false stories because she knows he will not believe anything she says.

178. On a February 17, 2020 call at or about 1353hrs, Letecia told a female, believed to be associated with Laura Abernathy, that she was thinking about flying out to Colorado to take a lie detector test to prove her innocence. During that call, she stated, "They think I'm still in Colorado".

179. On another February 17, 2020 call at or about 1611hrs, Letecia told an unknown female that she is going to take a lie detector test, but that the test is not admissible in court, and no law enforcement would be present.

*Letecia attempted to obtain "fake polygraph" results*

180. On a February 18, 2020 call at or about 1014hrs, Letecia called 321-247-6876. I conducted research on that phone number, and learned it was associated with "fakepolygraph.com". During that call, Letecia stated she never got a confirmation for a test she paid for. Letecia provided the spelling of her name, and before disconnecting the call, the unknown male stated he would resend her the results to her email.

181. I viewed the website "fakepolygraph.com", and found the following information:

## Fake Polygraph Test

Get a Fully Verified Fake Polygraph Test Certificate, proving you have taken a real Polygraph test.

You choose the "Questions", "Location" and "Results". We send you a Fully Verified Report within 1 business hour!

The Fake Polygraph Results are emailed from a Local & Real Polygraph Company.

If your partner calls the authentic company, our team will confirm the test details. We are sure they will believe you!

We have nationwide "Real" polygraph companies in the following countries:

UK, Ireland, Australia, USA & Canada.

100% Money Back Guarantee - No Link Between Real and Fake Polygraph Company

Our Polygraph Reports are 3-4 Pages & Replicate a Real Report

The Local Polygraph Company Branding and Contact Details are the Fake Polygraph Test Report.

The Polygraph Test Results are emailed from a Real Polygraph Company.

*Screenshot taken on 02/19/2020 from http://www.fakepolygraph.com*

182. Also on February 18, 2020, at or about 1116hrs, Letecia again called 321-247-6876. During this call, Letecia inquired about an email she received. The unknown male stated that her report was blocked by management based on the content of the questions, and stated that with any illegal activities they reserve the right to not send the report. Letecia's response was the following:

Letecia: "What do you do now, just delete it and go on about life and keep the money?"

Male at FakePolyGraph.com: "Yes, we do indeed"

Letecia: "Ok, I gotcha, thank you, goodbye"

183. Investigations contacted Luke Devlin utilizing the phone number 321-247-6876 that Letecia called. Mr. Devlin provided information to investigators, including the questions and answers that Letecia had provided.

184. Letecia provided the following questions and the answers that were supposed to be truthful to "fakepolygraph.com"

    a. Do you intend to answer these questions regarding your stepson truthfully? **YES**

    b. Is your birthday REDACTED? **YES**

    c. Did you participate in any way in causing harm to your stepson? **NO**

    d. Did your stepson return with you to your home? **YES**

    e. Did you participate in any way in causing the death of your stepson? **NO**

185. I submit to the court that if Letecia had nothing to hide, she would not have to pay for fake polygraph results.

### Conclusion

186. Based on data collected by the FBI, and reported in the Journal of Forensic Sciences, I learned that in over 71% of homicide cases that involve false reporting, the reporting party is responsible for the murder. To be clear, this statistic is not being provided as sole probable cause for the requested warrant, but as an additional fact to be combined with others listed in this affidavit. [1]

187. Based on Letecia's internet history, it is reasonable to believe that she was unhappily married to Mr. Stauch, and had some degree of resentment towards the family as a stepparent. Furthermore, days before Gannon's murder, Letecia appeared to be researching a move to another state to a two-bedroom apartment.

188. Letecia has not provided a fully truthful statement to investigators at any point during this investigation, particularly regarding the circumstances of Gannon's disappearance. This would reasonably be suspected activity of an individual that committed the crime under investigation, namely murder. Within approximately 24 hours of Gannon being reported missing, and without external prompt, Letecia made claims to law enforcement that she was being set up.

189. Initially, Letecia said Gannon was playing with a neighborhood friend between approximately 1515hrs and 1600hrs, and was expected home at 1800hrs. Within a few days, Letecia changed her story to label herself as a victim of rape, felony menacing with a weapon, and assault, resulting in Gannon's abduction by her rapist. Her stories continued to evolve to include a new location of Gannon's disappearance over 30 miles away, several completely different sets of circumstances, and unprompted explanations for why Gannon's blood would be found by investigators in key locations.

190. Letecia was unable to provide a logical reason why she rented another vehicle while she still had access to the Tiguan. Based on the aforementioned facts, it was likely because it contained the remains of, or evidence of Gannon's remains, based on positive reactions to luminol in the Tiguan on the bumper, indicating the likely presence of blood on the rear tailgate. A suspected blood sample from the interior of the trunk area returned a negative result for the presumptive presence of blood.

191. Gannon's mattress has a large red stain on it that is consistent with blood. Based on the orientation of the mattress in the room, it appears that is where Gannon's head and upper torso would have been. Below that same area, a substance that was confirmed as blood by the Metro Crime Laboratory soaked through the carpet, the pad, and stained the concrete. This blood matches the DNA profile for Gannon Stauch. In this same area, blood samples taken from the wall, namely an electrical outlet, were also confirmed to match Gannon's DNA profile.

192. Gannon's blood, again matched to his DNA profile, was also found on a piece of particleboard in the area of Hwy 105/S Perry Park Rd in Douglas County, Colorado. This particular area is consistent with

---

[1] Journal of Forensic Sciences, May 2011, Vol. 56, No.3, False Allegation of Child Abduction

Letecia's travels on January 28, 2020, and January 31, 2020 based on GPS tracker locations of her Nissan Altima rental vehicle, and raw data from the Tiguan.

193. During her stories to Mr. Stauch, without prompt, Letecia provided explanations for why blood would be found on Gannon's bedroom wall. Other than Letecia being present for Gannon's murder, and being present for the cleaning of the murder scene, there is no reasonable explanation for how Letecia would know there was blood on Gannon's wall, as that evidence had not been released to the media. Again, without prompt, Letecia provided an alibi for why she was in the area where the particleboard was recovered.

194. By combining cell tower data, reviewing video surveillance, and home security system logs, investigators believe based on the evidence the only three individuals with access to Gannon on the afternoon of January 27, 2020 were Letecia, Harley, and eight-year-old Laina. With the exception of Laina, who is not considered a suspect, it appears nobody other than Letecia was with Gannon at the Stauch residence between the hours of approximately 1416 and 1734hrs on January 27, 2020, when investigators suspect Letecia murdered Gannon.

195. Gannon has been missing for approximately four weeks, and there has been national news attention on major networks related to his disappearance. Local efforts, including posters, news coverage, search teams, and social media postings have also failed to locate Gannon. Aerial assets, infrared/FLIR technology, and other extra ordinary methods have been deployed to help locate Gannon.

196. Over 200 volunteers have helped to search for Gannon, comprising thousands of man-hours in several different locations. Additionally, although the EPSO has received hundreds of tips, nobody has provided information that has led to Gannon's location. His family and friends have not heard from him, and Gannon is only 11 years old with no financial resources.

197. Letecia Stauch was the last person to see Gannon alive. Investigators have not located Gannon's remains at this point in time, although the search continues. As additional time increases without locating Gannon, the more likely it is that Gannon is not alive.

198. Based on the facts set forth above, I submit probable cause exists to believe that, on or about January 27th, 2020, within the State of Colorado, and within El Paso County, Letecia Stauch committed the offenses, in violation of Colorado Revised Statues to include: Murder in the First Degree - Child Under Twelve - Position of Trust, §18-3-102(1)(f), Child Abuse Resulting in Death, §18-6-401(1)(a), Tampering with a Deceased Human Body, §18-8-610.5, and Tampering with Physical Evidence, §18-8-610(1)(a).

199. Therefore, Your Affiant respectfully requests the issuance of an arrest warrant charging the same.

Applicant: Jessica Bethel
El Paso County Sheriff's Office
Position: Detective

Sworn and subscribed before me this day _____ 28th _____ of February, 2020

Judge